## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| JONIQUE DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CV 01-BU-1037-S |
| ASSOCIATION FOR RETARDED | ) | |
| CITIZENS OF JEFFERSON | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTERED**

DEC 1 2 2001

---

## Memorandum Opinion

---

In the above-styled action, Plaintiff Jonique Davis brings
claims alleging that her former employer, Defendant Association for
Retarded Citizens of Jefferson County ("the ARC"), violated her
rights protected by the Family and Medical Leave Act of 1993, 29
U.S.C. § 2601 et seq. ("FMLA" or "the Act"). In particular, Count
I of Davis's complaint asserts that the ARC interfered with her
rights under the FMLA, while Count II alleges that the ARC
retaliated against Davis for exercising her FMLA rights. Now
before the Court are cross-motions for partial summary judgment.
In its motion filed October 16, 2001 (Doc. 10), the ARC asserts
that it is entitled to summary judgment on Davis's claim in Count
II that she was discharged in retaliation for exercising her FMLA

rights.[1] Davis, in turn, filed a motion October 26, 2001 (Doc. 14) urging that the Court issue an order declaring that the ARC is collaterally estopped from asserting in this litigation that Davis was terminated for the falsification of her time card. The parties have filed evidence and fully briefed these motions, which are now ripe for decision. The Court concludes that Davis's motion for partial summary judgment (Doc. 14) is due to be **DENIED** and that the ARC's motion for partial summary judgment (Doc. 10) is due to be **GRANTED**.

## I.   SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a plaintiff or a defendant may move "with or without supporting affidavits" for summary judgment in its favor on "a claim" or "any part thereof." Fed. R. Civ. P. 56(a) and (b). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the

---

[1]On November 21, 2001, Defendant filed a second motion for partial summary judgment, pertaining to Plaintiff's FMLA interference claim. (Doc. 25). However, that motion has not been fully briefed and, thus, is not yet ripe for decision. Accordingly, the Court will not address that second motion here.

initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.' " Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p.299). Because the parties have

filed cross-motions for partial summary judgment, the Court must view the evidence in the light most favorable to the ARC when considering Davis's motion, while viewing the evidence in the light most favorable to Davis when considering the ARC's motion.

## II.  BACKGROUND

The ARC hired Davis in July 1994 to work as a secretary at its Birmingham office.  Approximately six months later, she became a clinical aide, working in the ARC's "day program."  In that capacity she was responsible for scheduling, transporting, and follow-up paperwork for clients who required medical appointments. She held this position until she was terminated on July 24, 2000. The ARC contends that the decision to discharge Davis, which was made by her immediate supervisor, Marriette Horschel, was occasioned by Davis's submission of a falsified time sheet.  Davis, on the other hand, claims her termination was actually in retaliation for her taking FMLA-protected leave.

Hourly employees at the ARC, which included Davis, were supposed to fill out weekly time sheets.  According to Davis, however, this rule was laxly observed until after the ARC was audited several months prior to July 2000.  Davis claims that, prior to that time, she only rarely submitted a time sheet and that other employees did likewise, but that after the audit, supervisors were more diligent about requiring completed time sheets.  Davis

Depo. at 125-26, Plaintiff's Exhibit 6.   Thus, after the audit
Davis began to submit her time sheets "pretty regularly," Davis
Depo. at 126, and she suggested that Horschel would sometimes fill
them out for her when she failed to do so.   Id. at 97.

When Davis arrived at the beginning of each workweek, she
would normally "prefill" her time sheet.   That is, she would sign
her sheet and put projected "in" and "out" times in advance for the
entire week.   Davis claims that this was customary not only for
her, but numerous of her co-workers as well.   Indeed, the ARC's
Human Resources Coordinator during the relevant period, LaWana
Dabney, acknowledged being aware that prefilling time cards was a
common employee practice.   Davis further suggests that she and the
other employees did so because, following the audit, Horschel, the
ARC's Assistant Director for Residential Services, had told them
"to fill something out" in all the time sheet spaces "whether
[they] had a lunch break or not" because the ARC "had to have
something in [their] file."   Davis Depo. at 124-26.   See also id.
at 94-96.

Because the time sheets of Davis and other employees contained
entries that were projected, they would often inaccurately reflect
the actual times that employees worked.   For example, on Monday,
July 17, 2000, Plaintiff prefilled her time sheet for that entire
workweek, which concluded Friday, July 21.   In the spaces for all

five days, she wrote down the ARC's "regular," 8-hour work schedule: arrive "in" at 8:00 a.m., "out" at 12:00 for lunch, back "in" from lunch at 12:30 p.m., and finally "out" for the day at 4:30 p.m. There were several days that week, however, where Davis had to work through lunch and did not take a break. Davis Depo. at 95, 128. Davis similarly recounted that there had been other weeks where she had prefilled her time card in the same fashion but she had arrived at work earlier than the listed time because she had early client appointments. Id. at 127. Davis explained, though, that, even on these occasions where she did not take a lunch break or began work earlier than normal, it was not necessary for her to seek any kind of adjustment to her pay because she still was working approximately eight hours each day. When she did not take a lunch break, Horschel allowed her to leave at 4:00 p.m. rather than her regular 4:30, and when Davis came in early for a client appointment, she was likewise permitted to leave early to compensate. Id. at 127-129. Despite such discrepancies between her time card entries and the actual times she was working, Davis never made alterations to her prefilled entries on her time sheets, nor was she ever advised that she should do so.

At about 7:45 a.m. on Friday, July 21, 2000, Davis arrived at the building containing the ARC's offices. As she regularly did, Davis was carrying her eleven-month old son, Jordan, whom she

routinely dropped off at an adjacent child daycare facility operated for the ARC employees.  On that morning, however, Davis arrived at the daycare facility to discover that it was without power.  This concerned her because Jordan suffered from chronic asthma, which she knew could be triggered by the excessively high temperatures common to the Alabama summer.  Davis used her cell phone to call Horschel at home and advise her that the power was off at the ARC's daycare facility.  Horschel replied that the area where the ARC's offices was located, on the opposite side of the building, had partial power, and she implied that Davis should report for work.

Believing that power would likely be restored soon to the daycare facility, Davis left her son there and went around to her office.  That morning, Davis and another clinical aide, Greg Anderson, were out of the office taking a client to a doctor's appointment.  After doing so, Davis's concerns about her son being at the ARC's daycare facility increased, as she noticed that it was getting hotter and that Anderson, who also has asthma, had been required to use his inhaler several times while they had been out. At about noon, Davis and Anderson returned to the ARC's offices, and, after passing through them briefly, Davis proceeded to check on her son.

Upon arriving at the daycare, Davis found that it was still

without power.  Inside it was dark, hot, and stuffy, "burning up,"
according to Davis.  When she got to the baby room she found her
son was "drenched sweating."  Fearing that he was at risk of having
an asthma attack, Davis told her son's teacher that she was taking
him home immediately, and she signed him out.

Davis was aware that she was to notify Horschel if she was
leaving work prior to her scheduled time, or, if Horschel was out
of the office, Davis was to give such notice to Horschel's
secretary, Dorothy Jones.  Horschel was out of the office that
Friday, and Davis knew that such was the case.  Therefore, Davis
explained, as she was walking with her son from the daycare back
towards the part of the building containing the ARC's offices,
Davis used her cell phone to call Horschel's pager number in an
attempt to contacting her.  But Horschel never returned the page or
otherwise spoke with Davis the rest of that day.  Davis arrived
back at the ARC's offices, but she did not see Horschel, Jones, or
Mike Mitchell, the director of the day program, so Davis alerted
several co-workers that she was taking her baby home because he had
asthma and the power was out at the daycare center and asked that
they relay that information to Horschel or Jones.  Once Davis got
in her car, she dialed the office extensions of both Horschel and
Jones in a final attempt to contact them, but to no avail.  At
about 12:30 p.m., Davis left work for the day.  Davis admits,

however, that the time sheet she had prefilled and signed at the beginning of that week, which she left on a clipboard in her work area, still stated that she had worked until 4:30 p.m., a full 8-hour day, and 40 hours for the week.

Although Davis said she looked for and tried to call Jones, Horschel's secretary, to inform her that she was leaving for the day, Jones was, in fact, at the office during that Friday.  Soon after Davis was gone, an ARC staff member informed Jones that Davis had left work to pick up her child because of a power outage at the ARC daycare facility.  At about 1:40 p.m., Jones asked if Davis had returned to work and was told that she had not.  Jones also observed that Davis's car was not in the parking lot.  At about 4:00 p.m., Jones received a call from Horschel, whom Jones told that Davis had left work at about 12:30 p.m. and had not returned.

The following Monday, July 24, 2000, Davis reported to work after dropping off her son at the daycare center, its electricity having been restored.  Davis stopped by her office for about 30 to 45 minutes to make preparations to take an ARC client to an appointment scheduled for that morning.  While in her work area, she noticed that someone had come by and picked up her time sheet from the week before.  Nonetheless, she left the office for her client appointment that morning without seeing Horschel or notifying her that she, Davis, had left early on the previous

Friday.

Davis states, however, that she was not particularly concerned at that time about any inconsistency between her time sheet representation that she had worked a full day the prior Friday and the reality that she had left several hours early. This is because, she explained, it was customary that adjustments to an employees' pay or time card could be effectuated through the submission of a request sheet under the ARC's "earned time" policy. Davis Depo. at 132. Pursuant to that policy, the ARC permitted its employees to accrue paid time off and use it for vacation, absences due to illness or injury, holidays, and for bereavement. See Plaintiff's Exhibit 12. Davis testified that on many prior occasions, exigent circumstances had required her to be absent during her regular work hours, and Horschel had allowed her to submit an earned time request sheet after the fact, even up to about a week later. Davis Depo. at 133 Other times, Davis relates, she had advised Horschel that she would be absent and Horschel had completed the earned time form on behalf of Davis and had Davis's paycheck adjusted accordingly. Id. at 97, 133. Thus, Davis states that, on the morning of July 24, she believed that she would be permitted an opportunity to fill out an earned time sheet later or that Horschel would know the circumstances of why Davis had been absent and would likely fill out an earned time sheet for

her.

Davis did not return to the office from her client appointment until later that afternoon.  According to Davis, she had been back for approximately 15 minutes, when at about 3:30 p.m., Horschel requested that she come upstairs to Horschel's office. Once Davis was there, Horschel asked her to confirm that she had left early the previous Friday while her time card indicated that she worked until 4:30 p.m.   Davis acknowledged that her time card was incorrect, but she explained that her leaving had been an emergency in that, because the daycare facility lacked electricity, her priority had been to get her son out of the heat and into a cool environment.  Davis then asked Horschel if she wanted her to change her time sheet or fill out an earned time sheet, but Horschel replied, "No, forget it.  You're fired."  Horschel presented Davis with a form she had completed informing her that she was being fired for falsifying her time record, to wit, that she had left at approximately 1:30 p.m. on the previous Friday without returning while her time sheet stated that she had left at 4:30 p.m.

Subsequently, Davis applied for unemployment benefits from the Alabama Department of Industrial Relations ("DIR").  See § 25-4-1 et seq., Ala. Code (2000).  At the initial administrative stage, a DIR examiner determined that Davis was completely ineligible for unemployment benefits pursuant to § 25-4-78(3)(a),  which provides

that an individual is so disqualified if he is "discharged or removed from his work for a dishonest or criminal act committed in connection with his work . . . ."

Davis appealed the examiner's decision to the appeals tribunal, pursuant to § 25-4-91 and § 25-4-92, Ala. Code. Following an evidentiary hearing on Davis's claim, an appeals referee prepared a written opinion that modified the examiner's decision. The referee disagreed with and reversed the examiner's finding that Davis was completely disqualified from receiving benefits under § 25-4-78(3)(a). On that issue, the referee wrote in pertinent part as follows:

> Section 25-4-78(3)(a) of the Law requires a disqualification of an individual if she has been discharged or removed from work for committing a dishonest or criminal act in connection with the work. 'Dishonesty' is defined as being characterized by a lack of truth, honesty, probity, or trustworthiness, or by an inclination to mislead, lie, cheat, or defraud. This is a very serious charge to make against an individual and for a disqualification to be assessed under this section of the Law, the evidence must be clear and convincing.
> . . . .
> The evidence in this case clearly shows that the time sheet the claimant had completed was not correct. The evidence further shows that this was not an uncommon practice and the claimant's opportunities for having corrected the incorrect time sheet were minimal. While it may be true that she could have persisted until she found the time sheet and made the corrections it is also evident that in such circumstances in the past it had not been viewed as being so important. It is evident that completing these time sheets prior to the day that they are to be turned in was not uncommon at all and that on many occasions the claimant had been allowed to correct

the time sheet. Therefore, in the Administrative Hearing
Officer's opinion, the evidence offered is not so clear
and convincing as to show that the claimant intended to
mislead, lie, cheat or defraud. Therefore, the claimant
would not be subject to the more severe disqualification
applicable under the provisions of Section 25-4-78(3)(a)
of the Law.

"Decision on Unemployment Compensation Claim" by DIR Referee,

Defendant's Exhibit F (hereinafter "Referee Opinion") at 2.

However, the referee determined that Davis was subject to a partial

disqualification from four weeks of benefits, pursuant to § 25-4-

78(3)(c), stating as follows:

> Section 25-4-78(3)(c) of the Law requires a
> disqualification of an individual if she has been
> discharged from her most recent bona fide work for
> misconduct committed in connection with the work.  This
> [section] is applicable in situations that do not rise to
> the level of being dishonest but in situations that do
> cause a deliberate, willful, or wanton disregard of an
> employer's interests.
> . . . .
> The evidence does show that the claimant left
> without notifying the proper personnel.  Although it may
> have been easily observed that the claimant had left in
> a situation that could be viewed as an emergency
> situation, it is evident that she could have made more
> effort to notify the administrative assistant that it was
> necessary for her to leave.  Her leaving without
> permission and/or notification to the proper individuals
> was not in the employer's best interests.  Therefore, it
> constitutes a simple act of misconduct.  Therefore, the
> claimant would be subject to a disqualification under the
> provisions of Section 25-4-78(3)(c) of the Law.

Id.  Neither side sought judicial review of the referee's

administrative decision, which became final on October 5, 2000.

On April 25, 2001, Davis filed her complaint in the instant

action.  In Count I, she alleged that the ARC had interfered with her FMLA rights by, inter alia, penalizing her "points" under its attendance policy for instances of FMLA-qualified leave and terminating her employment.  In Count II, based upon the same factual allegations, Davis asserted that the ARC had retaliated against her for having exercised her FMLA rights.  Following discovery, the ARC filed its instant motion for partial summary judgment, which pertains only to Davis's claim, found in Count II, that she was terminated in retaliation for having taken FMLA-qualified leave.  Therein, the ARC argues that the evidence shows that it discharged Davis because she falsified her time sheet, not because she took FMLA leave.  The ARC further contends that the referee's final administrative decision in Davis's unemployment benefits appeal establishes that she submitted a false timecard and was discharged for misconduct, and that she is, therefore, collaterally estopped from now asserting that she was terminated because she exercised her FMLA rights.  In response, Davis filed her instant cross-motion for partial summary judgment, in which she agrees that the doctrine of collateral estoppel is applicable, but she asserts that it precludes the ARC from here asserting that it fired her because of her false time sheet.  The Court now turns to consider the merits of these cross-motions.

III.  DISCUSSION

A.   **The Family and Medical Leave Act**

In 1993, Congress enacted the FMLA to balance the demands of the workplace with the needs of families by entitling employees to take reasonable medical and family-related leave, while at the same time accommodating the legitimate needs of employers.  29 U.S.C. § 2601(b) (2000).  Among the substantive rights granted by the FMLA to eligible employees are the right to "12 workweeks of leave during any 12-month period . . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee," 29 U.S.C. § 2612(a)(1), and the right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position, 29 U.S.C. § 2614(a)(1). In <u>Strickland v. Water Works and Sewer Bd. of City of Birmingham</u>, 239 F.3d 1199, 1206-07 (11th Cir. 2001), the United States Court of Appeals for the Eleventh Circuit recently explained the two types of claims that are available under the FMLA and the fundamental difference between them:

> To preserve the availability of [substantive FMLA] rights, and to enforce them, the FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, <u>see</u> 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, <u>see</u> 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c)

('An employer is prohibited from discriminating against employees ... who have used FMLA leave."). To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied. O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1353-54 (11th Cir. 2000); King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999). In contrast, to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right. King, 166 F.3d at 891. In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.' Id.

(footnote omitted).

The ARC's motion for partial summary judgment concerns only the latter type of claim, for retaliation. More specifically, it pertains to Davis's retaliation claim alleging that the ARC terminated her for exercising her substantive FMLA rights. In order to prevail on this claim, Davis has the burden at trial to prove that her termination was motivated by her exercise of an FMLA right. Strickland, supra. Davis asserts that the leave she took on the afternoon of Friday, July 21, 2000, was protected under the FMLA and that Horschel was motivated to fire her because Davis took such leave. The ARC denies that it discharged Davis because she took FMLA leave and claims, rather, that she was fired because she submitted a false time sheet.

**B.   Collateral Estoppel**

Both parties affirmatively seek to avail themselves of the doctrine of collateral estoppel, which "precludes a party from relitigating an issue that was fully litigated in a previous action." <u>Palciauskas v. United States</u>, 939 F.2d 963, 966 (11th Cir. 1991) (<u>quoting</u> <u>Deweese v. Town of Palm Beach</u>, 688 F.2d 731, 733 (11th Cir. 1982)).  The ARC contends that the referee in Davis's administrative appeal in her unemployment benefits case resolved that the reason for Davis's termination was her own misconduct and that she is thus precluded from asserting in this forum that her taking FMLA leave was instead what caused her discharge.  Davis agrees that collateral estoppel applies, but she maintains that the referee actually determined that she was not "properly" terminated for falsifying her time records, Plaintiff's Brief in Support of Motion for Partial Summary Judgment at 19.  Therefore, she argues, summary judgment for the ARC is not proper and that the referee's finding on the matter precludes the ARC from taking the position that it terminated her for that reason.

There is a general presumption that, when a state administrative agency "acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." <u>University of Tennessee</u>

v. Elliott, 478 U.S. 788, 799 (1986) (internal quotation marks omitted).  The Supreme Court has cautioned, though, that "[c]ourts do not, of course, have free rein to impose rules of preclusion, as a matter of policy, when the interpretation of a statute is at hand.  In this context, the question is not whether administrative estoppel is wise but whether it is intended by the legislature." Astoria Federal Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991).

There is no Supreme Court or Eleventh Circuit authority on the issue of whether the doctrine of collateral estoppel applies to state agency findings in the context FMLA claims.[2]  However, the Court will simply assume that it does, since both parties expressly argue that the doctrine should apply in this case.  Accordingly, the Court will give the same preclusive effect to the referee's findings as would Alabama state courts.

In Wal-Mart Stores, Inc. v. Smitherman, 743 So. 2d 442 (1999), the Alabama Supreme Court recognized the applicability of collateral estoppel to findings made in an administrative appeal

---

[2]Only a few district courts appear to have addressed the issue of whether state administrative findings should be given preclusive effect in FMLA cases, with those that have done so deciding, expressly or implicitly, that they should.  See Bourgo v. Canby School Dist., 167 F. Supp. 2d 1173, 1176-78 (D. Ore. 2001); Kosakow v. New Rochelle Radiology Assocs., 88 F.Supp.2d 199, 209 (S.D.N.Y. 2000); Plumley v. Southern Container, Inc., 2001 WL 1188469, *8 (D. Me. 2001); Russo v. Jefferson Parish Water Dept., 1998 WL 19629, *3 (E.D. La. 1998).

considering whether an individual is disqualified from receiving

unemployment compensation benefits if five elements are present.

Those elements are:

> (1) there is identity of the parties or their privies;
> (2) there is identity of issues; (3) the parties had an
> adequate opportunity to litigate the issues in the
> administrative proceeding; (4) the issues to be estopped
> were actually litigated and determined in the
> administrative proceeding; and (5) the findings on the
> issues to be estopped were necessary to the
> administrative decision.

Id. at 445 (citation and internal quotation marks omitted).

The Court concludes that the doctrine of collateral estoppel

does not bar the ARC from here asserting that it terminated Davis

because she falsified her time sheet.  This is so because the issue

to be estopped was not actually determined in the administrative

proceeding, as required by the fourth element in Smitherman.  More

specifically, the referee in Davis's unemployment appeal did not

make any statement that could be construed as a finding that the

ARC was not motivated by Davis's falsification of her time sheet.

The referee did determine that although Davis's time sheet was

false, such did not subject her to the complete disqualification

from unemployment benefits for a "dishonest or criminal act" in

connection with her work pursuant to § 25-5-78(3)(a).  However, it

is unmistakable that the referee concluded that Davis's

falsification of her time sheet did not subject her to the complete

disqualification of that statute not because such falsification was not the ARC's motivation for discharging Davis, but rather because the referee found that the circumstances surrounding Davis's creation of and failure to correct the falsification did not allow her conduct to be characterized as a "dishonest or criminal act" for purposes of the statute.  He stated, "in the Administrative Hearing Officer's opinion the evidence offered is not so clear and convincing as to show that the claimant intended to mislead, lie, cheat, or defraud.  Therefore, the claimant would not be subject to the more severe disqualification applicable under the provisions of Section 25-4-78(3)(a) . . . ."  (Emphasis added).  Accordingly, it is clear that the sole focus of the referee on this point was Davis's intent.  In fact, the referee's opinion includes findings that Davis "was discharged by her supervisor for falsifying her time records," Referee's opinion at 1, and that by the time Davis returned to the office on Monday afternoon, "the employer had already concluded that [she] had no intentions of correcting [her] time sheet and they (sic) regarded it as a falsification of record which they (sic) reviewed as being a dishonest act."  Id. at 2. Thus, if the referee's opinion suggests anything on the matter of the ARC's motivation, it is that the referee actually credited the ARC's assertion that it believed Davis had a fraudulent intent in falsifying her time sheet.  That being the case, there are no

grounds to preclude the ARC from asserting or proving that it did fire Davis for such a reason.

Nonetheless, Davis argues that the referee's findings that she was not subject to the disqualification of § 25-4-78(3)(c) because she did not intend to defraud the ARC in connection with her false time card shows that the ARC did not "properly" or "fairly" terminate her for that reason. Plaintiff's Brief in Support of Motion for Partial Summary Judgment at 19; Plaintiff's Brief in Response to Defendant's Motion for Partial Summary Judgment at 35. Thus, she contends that the ARC should be collaterally estopped from raising the falsification of her time sheet as a reason for its decision. The Court disagrees.

The question of whether Davis was subjected to unlawful retaliation under the FMLA depends entirely upon the beliefs and motivation of the employer; whether Davis subjectively intended to defraud, lie, or cheat and, indeed, even whether she was actually guilty of violating any rule of her employer are not dispositive of her retaliation claim. If the ARC, through Horschel, was honestly motivated to fire Davis because her time sheet did not reflect the hours she truly worked, then it simply does not matter whether the ARC's decision was based upon an erroneous understanding of Davis's intent or other underlying facts. See Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired

an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981."); Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Nor would it matter whether this Court or a jury would deem the ARC's decision to be otherwise "unfair" generally because Davis did not have a dishonest intent. See Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. We are not in the business of adjudging whether employment decisions are prudent or fair." (internal citation omitted)); Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."). See also Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Thus, the referee's finding that Davis did not have a fraudulent intent to mislead the ARC into paying her for time she did not work does not preclude the ARC from arguing that it terminated Davis for reasons associated with her time sheet. See Comeaux v. Uniroyal Chemical Corp., 849 F.2d 191, 194 (5th Cir. 1988), abrogation on

other grounds recognized by <u>Carroll v. General Acc. Ins. Co. of America</u>, 891 F.2d 1174 (5th Cir. 1990). Accordingly, Davis's motion for partial summary judgment is due to be denied.

The ARC has also claimed that the doctrine of collateral estoppel applies in its favor. The ARC highlights that the referee determined that Davis engaged in misconduct that subjected her to a partial disqualification of unemployment benefits under § 25-4-78(3)(c). Such a finding, the ARC urges, estops Davis from claiming that she was actually discharged for some other reason, including that she had taken FMLA leave. The Court pretermits any discussion of this issue, however, because even assuming that collateral estoppel does not preclude Davis's FMLA retaliatory discharge claim, the ARC is entitled to summary judgment on the merits.

## C.   The Merits of the FMLA Retaliation Claim

"When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, [courts] apply the same burden-shifting framework established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 [ ] (1973)."[3] <u>Strickland</u>, 239 F.3d at 1207. (<u>citing</u> <u>Brungart v. BellSouth Telecomm. Inc.</u>, 231 F.3d 791, 798 (11th Cir. 2000)).

---

[3]In their briefs, both parties assume that the <u>McDonnell Douglas</u> formula applies, thus implicitly acknowledging that Davis is proceeding under a theory utilizing circumstantial, rather than direct, evidence.

Under this framework, the plaintiff must first establish a prima facie case of discrimination, which creates a presumption of discrimination.   The employer must then produce sufficient admissible evidence to indicate that it took the employment action at issue for one or more legitimate reasons.  If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to discredit the proffered nondiscriminatory reasons by showing that they are merely a pretext for unlawful discrimination.  See McDonnell Douglas, 411 U.S. at 802-05; see also Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56 (1981).

To establish a prima facie case of retaliation under the FMLA, Davis has the burden at trial to prove: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity.  Strickland, supra.  Davis contends that the evidence indicates that these elements are met because the leave she took on the afternoon of Friday, July 21, 2000, was protected under the FMLA, that she suffered an adverse employment action by virtue of her termination on Monday, July 24, 2001, and that Horschel had been advised of the reason for and circumstances surrounding Davis's leaving on Friday when Horschel communicated her termination decision to Davis on Monday.

The ARC appears willing to concede, at least for purposes of its motion, that the first two elements of the prima facie case can be met. It puts up some fight that the third element has not been met, but the Court disagrees. "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." Brungart, 231 F.3d at 799. This rule normally applies unless there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct. Id.; Strickland, 239 F.3d at 1207-08. To this point, the ARC has failed, as the movant for summary judgment, to establish that any of the following is false or cannot be proven by Davis: (1) that Davis's leave on that Friday afternoon was protected by the FMLA, (2) that Davis was terminated the following Monday afternoon, and (3) that Horschel was aware of the reason for and circumstances surrounding Davis's leaving when Horschel communicated her termination decision to Davis. If one assumes the truth of those propositions, which the Court will here do, it is clear that they would be sufficient for a factfinder reasonably to infer causation for purposes of a prima facie case. See, e.g., Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999); Goldsmith v. City of Atmore, 996 F.2d 1155, 1163-64 (11th Cir.

1993); Donnellon v. Fruehauf, 794 F.2d 598, 600-601 (11th Cir. 1986).

At the intermediate stage of McDonnell Douglas, the ARC offers Horschel's affidavit and the exhibit attached thereto, the "Counseling Statement/Corrective Action Form" completed by Horschel and presented to Davis upon her termination. See Plaintiff's Exhibit D. These pieces of evidence tend to show that Horschel decided to fire Davis because she falsified her time sheet. This satisfies the ARC's burden, which is one of mere production, not persuasion, to offer evidence that it took the employment action in question for a legitimate reason. See Burdine, 450 U.S. at 255.

In order to survive summary judgment, Davis must now create a genuine issue of material fact as to whether the reason advanced by the ARC for her termination is merely a pretext for retaliation because she took protected leave. Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 658 (11th Cir. 1998). In other words, Plaintiffs must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the proffered reasons were not actually the motivation for the failure to train and promote them. See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998). Plaintiff may do this (1) by showing that the legitimate reason should not be believed; or (2) by showing that, in light of all of

the evidence, a retaliatory reason more likely motivated the decision than the proffered reason. <u>Mayfield v. Patterson Pump Co.</u>, 101 F.3d 1371, 1376 (11th Cir. 1996). <u>See also Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but cautioning that such a showing may not always be adequate to sustain a finding of unlawful discrimination).

Rather than attempting to argue that there is evidence indicating specifically that Horschel decided to terminate Davis's employment because Davis took FMLA leave, Davis focuses her pretext attack upon attempts to prove that the ARC's proffered reason should not be believed. First, Davis urges that there is evidence indicating that Davis, as well as numerous other employees working under Horschel, had routinely "falsified" their time sheets without being punished, insofar as their cards did not accurately reflect their actual "in" and "out" times. In particular, Davis claims that Horschel had actually instructed employees under her authority to put times in the "in" and "out" spaces reserved on the time sheets for lunch, regardless of whether the employees actually took a lunch break. Thus, Davis emphasizes, half-hour lunch breaks were

regularly reflected on time sheets when no lunch was taken, upon which days employees left at 4:00 p.m. while their time sheets indicated that they had left at 4:30 p.m.

The problem with Davis's argument on this point, however, is that it compares apples to oranges. The evidence to which Davis refers the Court surely tends to indicate that the ARC, or at least Horschel in particular, was not especially concerned about time card "falsifications" that related only to incorrect "in" and "out" times but where the number of hours actually worked by employees were accurately reported. In other words, such evidence suggests that Horschel did not mind if an employee's time card said she worked an eight-hour day and the "in" and "out" times were not accurate, <u>so long as the employee actually worked eight hours</u>. But that is not what occurred with the time sheet that the ARC claims led to Davis being fired. It is undisputed that not only were the "in" and "out" times wrong on Davis's time sheet in question but also that it reflected that Davis worked a full, eight-hour day on Friday, July 21, <u>when she actually worked less than six hours</u>. The difference between Davis's situation and those of other employees who had allegedly "falsified" their time sheets with wrong "in" and "out" times only is as obvious as it is significant. An hourly employee whose "in" and "out" times are incorrect but whose total numbers of hours worked are still right would be paid for the right

number of hours, but where there are extra work hours reflected on a time sheet, as in Davis's case, the employer could be misled into paying for hours the employee was not on the job. Therefore, the Court finds that the evidence cited by Davis, indicating that other employees had submitted time cards that were "falsified" only in the sense that they inaccurately reflected employees' "in" and "out" times, fails to create an issue of fact as to pretext.

Next, Davis points out that there is evidence indicating that it was common for employees to prefill their time sheets by completing them in advance using projected "in" and "out" times. However, the ARC has never suggested that it fired Davis because she "prefilled" her time sheet. The ARC maintains, rather, that Davis was fired because the time sheet that she completed, at whatever time, did not accurately reflect the number of hours she worked on Friday, July 21. The fact that Davis and many other employees may have filled out their time sheets in advance fails to directly confront the legitimate reason offered by the ARC.

And finally, Davis contends that pretext can be shown because she allegedly should, under the ARC's established policies and procedures, have been permitted to complete an earned time sheet on July 24 for her absence on July 21 but she was not given an opportunity to do so. There was testimony, as Davis argues, that employees of the ARC generally were allowed to fill out an earned

time request following an unscheduled absence, to claim paid time off that they had accrued to substitute for absences occasioned by a number of reasons, including illness to a family member.  But that is beside the point.  The ARC does not assert that it fired Davis because she was absent from work and she failed to put in a timely request to claim paid time off therefore.  It alleges that it terminated her because she submitted a time sheet that claimed entitlement to pay for hours that she admittedly did not work.  That the ARC did not, after confronting Davis with the falsification, allow Davis to attempt to correct her mistake by submitting a request that she instead be paid for the time missed from accrued earned time does not tend to show that the ARC's proffered reason is unworthy of credence.  The Court concludes that Davis has failed to show pretext, and that summary judgment for the ARC is, therefore, warranted on Davis's claim that she was discharged in retaliation for having taken FMLA leave.

### IV.   CONCLUSION

Based on the foregoing, the Court concludes that Davis's motion for partial summary judgment (Doc. 14) is due to be **DENIED** and that the ARC's motion for partial summary judgment (Doc. 10) on Davis's claim that she was discharged in retaliation for having exercised rights protected under the FMLA is due to be **GRANTED**.  As the Court finds that there is no genuine issue of material fact and

Page 30 of 31

that the ARC is entitled to judgment as a matter of law, that claim
is due to be **DISMISSED** with prejudice.   A separate order will be
entered.

    **DONE** and **ORDERED** this _____ day of December, 2001.


                                              _____
                                            H. DEAN BUTTRAM, JR.
                                   UNITED STATES DISTRICT JUDGE