UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 DEC 21  AM 9:03

U.S. DISTRICT COURT
N.D. OF ALABAMA

JONIQUE DAVIS,                    )
                                 )
        Plaintiff,               )
                                 )
    v.                           )
                                 )    CV 01-BU-1037-S
ASSOCIATION FOR RETARDED         )
CITIZENS  OF  JEFFERSON          )    **ENTERED**
COUNTY,                          )
                                 )    DEC 2 1 2001
        Defendant.               )

---

## Memorandum Opinion

---

In the above-styled action, Plaintiff Jonique Davis brings claims alleging that her former employer, Defendant Association for Retarded Citizens of Jefferson County ("the ARC"), violated her rights protected by the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA" or "the Act"). More specifically, in her complaint Davis asserts, among other things, that the ARC terminated her employment and assigned her "points" under its attendance policy for medically-related absences, thereby allegedly interfering with her rights under the FMLA and retaliating against her for exercising FMLA rights. The Court has previously granted the ARC's motion for partial summary judgment on Davis's claim that she was discharged in retaliation for taking FMLA-protected leave.

Now before the Court is the ARC's "Second Motion for Partial Summary Judgment," filed November 21, 2001, which pertains to Davis's remaining claims.   (Doc. 25).   In consideration of the record evidence and the arguments briefed by counsel, the Court concludes that the ARC's "second" motion for partial summary judgment is due to be **GRANTED** and that this action is due to be **DISMISSED** with prejudice.

## I. BACKGROUND

The ARC hired Davis in July 1994 to work as a secretary at its Birmingham office.  Approximately six months later, she became a clinical aide in the ARC's Residential Services Department.   In that capacity she was responsible for scheduling, transporting, and follow-up paperwork for clients of the ARC who required medical appointments.  She held this position until she was terminated on July 24, 2000.

The record discloses that, between January 1996 and June 2000, Davis took time off from work on approximately 37 occasions for reasons that might be deemed medically related.  For each of these occasions, Davis submitted a written request to use hours from her "earned time" account, pursuant to an ARC policy that allowed employees to accrue paid time off that could be used for vacation, absences due to illness or injury, holidays, and for bereavement. Davis submitted some of these requests before she took time off, some were completed the same day as the leave sought, while others

were done after the fact.  On each of her request, Davis wrote a brief comment stating the reason for the time off.  All of the comments tend to indicate that the reason for leave related to an illness, physical malady, or some sort of medical care administered either to her or a member of her family.  On several request forms, such comments make apparent the specific underlying medical condition and the person to whom it relates.  For example, Davis stated on several forms that she was taking "Maternity Leave" in January and February 1996 and again during July, August, and September 1999 for the births of each of her two sons.  Similarly, a November 22, 1999 request for a half day off indicated that Davis had taken time off for a "Doctor Visit," parenthetically noting, "Baby has Asthma," while a form for an absence for April 22, 1999 states, "Mother-In-Law will have Heart Surgery (Major Bi-Pass)." And finally, a January 5, 1998 request for absences on December 29-31, 1998, states, "employee has the flu."  Otherwise, however, the earned time requests are unclear as to either the specific medical condition, who it related to, or why treatment was necessary.  For instance, the record shows that Davis was absent for three days in April 2000 in connection with a one-day surgery she had performed to remove a ganglion cyst from her wrist, and that she subsequently missed one day of work that June when she went to the doctor for a related follow-up visit.  However, on her earned time request forms submitted for these absences, Davis stated only that she needed

time off for a "One day surgery" and a "Follow-up visit from surgery." On her remaining earned time forms, she used similarly cryptic phrases, such as "Baby Sick," "Check-up for baby," "Employee Severely Sick/Pain," "Dental Visit," "Doctor Visit," and "Doctor Appointment." On a few occasions, Davis also presented her employer with excuse notes from medical sources in connection with absences. However, these notes were, like most of Davis's earned time request forms, vague with respect to the specific reason care was sought. Instead, they stated only generically that Davis or one her sons had been "ill" or had been under a doctor's care.

Davis does not allege that the ARC actually ever refused her permission to take a leave of absence for a medically-related reason. Indeed, it appears that if Davis had earned time hours in her account when she submitted her request, the ARC allowed her to substitute paid time off for her absences. As a result, Davis ultimately received pay for all or part of 32 of the 37 occurrences of medically-related absence.

Davis emphasizes, however, that on 26 of the 37 occasions that she was absent from work for medical reasons referenced above, she was penalized points under the ARC's attendance policy. Under that policy, employees are assessed points for occasions that they are absent from, late to, or leave early from, work when they fail to schedule the time off sufficiently in advance with their supervisor. Employees accumulate two points for each unscheduled

absence of one day, three points for each period of unscheduled absence of two or more days, one point when late for work, and one point when leaving work on an unscheduled basis.  Although by its terms the ARC's attendance policy contemplates the assessment of points for unscheduled absences due to "illness and injury" generally, the policy also expressly states that it does not apply to several types of specific absences, including FMLA leave.[1] Under the policy, progressive discipline is imposed based upon the number of points that an employee accumulates in a rolling 12-month period.  Employees are counseled when they accumulate 10 points, counseled and receive a written warning when they have 14 points, suspended for three days without pay and given a further written warning when they reach 18 points, and they are subject to termination when they reach 20 or more points.

The ARC subjected Davis several times to discipline of varying types under the attendance policy.  In early December 1996, Davis received a verbal warning and then a written warning advising her that she had accumulated 12 and 16 points.  On December 24, 1996, she was suspended for three days without pay for having been assigned 19 points.  Davis also received verbal warnings at the following times regarding the number of points she had accumulated

---

[1]Thus, the ARC's attendance policy would be considered to be of the "modified no-fault" variety, because no points are assessed against the employee for certain types of absences.  A "pure no-fault" policy, by contrast, makes no distinction between excused and unexcused absences.  See Dean Foods Co. v. United Steel Workers of America, 911 F. Supp. 1116, 1120 (N.D. Ind. 1995).

during the previous 12-month period:  October 1997; January, April, and December 1998; June 1999; and May 2000.

On the morning of Friday, July 21, 2000, Davis arrived at her office building shortly prior to the start of her 8:00 a.m. shift. Before reporting for work, Davis planned to drop off her younger son, Jordan, who was then 11-months old, at an adjacent daycare center operated for the ARC employees, as she regularly did. However, the daycare facility was without power that morning, which concerned Davis because she was aware that high temperatures increased the risk that Jordan might suffer an asthma attack. Believing the power would likely soon be restored, Davis decided to leave her son at the daycare facility and proceeded on to her office.

Davis left the office that morning to take an ARC client to a medical appointment.  Upon her return around lunchtime, Davis went to the daycare facility and found it was still without power. She proceeded to her son's room, which was very hot, and she found him "drenched sweating."  She immediately checked him out of the daycare and returned to her office, planning to take her son home.

Under her employer's policy, if Davis intended to leave work early, she was required to notify either her immediate supervisor, Marriette Horschel, or, if she was unavailable, Horschel's secretary, Dorothy Jones. Horschel was out of the office that day, and although Davis tried to page her, she ultimately was unable to

reach her.  Jones was present at the office that day, but Davis was unable to find her when she arrived back from the daycare center. So Davis advised several co-workers that she was taking her baby home because he had asthma and the power was out at the daycare center, and Davis asked that they relay such information to Horschel or Jones.  Davis left at approximately 12:30 p.m. and did not return.

Once she arrived at home, Davis immediately telephoned her pediatrician's office and asked whether she should bring Jordan in for an examination.  After Davis stated the circumstances and described her son's condition, a nurse with whom she spoke told her that it did not sound like she needed to bring him in, but that she should continue to monitor him, keep him in a cool environment, and give him plenty of fluids.  Davis followed these instructions and administered her son's regularly scheduled medication, and she was never required to seek any further medical attention for her son in connection with that day's events.

Although she had left work that Friday sometime between about 12:30 and 1:30 p.m., Davis had indicated on her time sheet for that week that she had left at 4:30 p.m.  Davis claims, however, that she was not attempting to obtain pay for hours that she did not work or otherwise cheat her employer.  She explains that she and other hourly employees routinely "prefilled" their time sheets at the beginning of each workweek.  Thus, on Monday July 17, 2000, she

had put projected "in" and "out" times on her time sheet spaces for every day, Monday through Friday, using the ARC's "regular" 8-hour work schedule:  arrive "in" at 8:00 a.m., "out" at 12:00 for lunch, back "in" from lunch at 12:30 p.m., and finally "out" for the day at 4:30 p.m.  When Davis left on Friday afternoon, she had left her "prefilled" time sheet on a clipboard in her work area, without thinking to change it to reflect that she had not worked a full day.

Soon after Davis was gone, an ARC staff member informed Jones that Davis had left work to pick up her child because of a power outage at the ARC daycare facility.  At about 1:40 p.m., Jones asked if Davis had returned to work and was told that she had not. Jones also observed that Davis's car was not in the parking lot. At about 4:00 p.m., Jones received a call from Horschel, whom Jones told that Davis had left work at about 12:30 p.m. and had not returned.

The following Monday, July 24, 2000, Davis reported to work. Davis stopped by her office for about 30 to 45 minutes to make preparations to take an ARC client to an appointment scheduled for that morning.  While in her work area, she noticed that someone had come by and picked up her time sheet from the week before. Nonetheless, she left the office for her client appointment that morning without seeing Horschel or notifying her that she, Davis, had left early on the previous Friday.

Davis did not return from her client appointment until later that afternoon. According to Davis, she had been back for approximately 15 minutes, when at about 3:30 p.m., Horschel requested that she come upstairs to her office. Once there, Horschel confronted Davis, asking her whether she had left early on the previous Friday and advising her that her time card indicated that she had worked a full day. Davis acknowledged that her time card was incorrect, but she explained that her leaving had been an emergency in that, because the daycare facility lacked electricity, her priority had been to get her son out of the heat and into a cool environment. Davis then asked Horschel if she wanted her to change her time sheet or fill out an earned time sheet. Horschel, however, replied, "No, forget it. You're fired." Horschel presented Davis with a form she had completed informing her that she was being fired for falsifying her time record, to wit, that she had left at approximately 1:30 p.m. on the previous Friday without returning while her time sheet stated that she had left at 4:30 p.m.

On April 25, 2001, Davis filed her complaint in this case. In Count I, she alleged that the ARC had interfered with her FMLA rights by, inter alia, penalizing her "points" under its attendance policy for instances of FMLA-qualified leave and terminating her employment. In Count II, based upon the same factual allegations, Davis asserted that the ARC had retaliated against her for having

exercised her FMLA rights.   The ARC filed a motion for partial summary judgment, directed at Davis's claim in Count II alleging that she had been discharged in retaliation for having exercised rights protected by the FMLA.   On December 12, 2001, the Court issued an order agreeing that partial summary judgment was warranted in the ARC's favor on that retaliation claim, because Davis failed to produce sufficient evidence to indicate that the ARC's proffered reason for terminating her, that she had falsified her time card, was merely a pretext.   <u>See</u> Doc's 29 & 30.   Now before the Court is the ARC's "second" motion for partial summary judgment, which is aimed at her remaining claims alleging that the ARC interfered with her FMLA rights and retaliated against her for exercising such rights.   More specifically, the Court discerns that Davis is at this point claiming that her termination also gives rise to an interference claim and that the ARC's assessment of points against her under its attendance policy, and resulting disciplinary   action,   constituted   unlawful   interference   and retaliation.   In its instant motion, the ARC argues (1) that many of the allegations in Davis's complaint cannot form the basis of an FMLA claim because they occurred outside the limitations period; (2) that the occasions on which Davis took leave forming the basis of her claims were not protected under the FMLA because they were not caused by a serious medical condition or because she failed to provide proper notice or medical certification to her employer; and

(3) that Davis's claims fail because she cannot show that, within the limitations period, she suffered injury or damage for which she might recover under the FMLA.   Davis disputes each of these arguments.

## II. SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a plaintiff or a defendant may move "with or without supporting affidavits" for summary judgment in its favor on "a claim" or "any part thereof." Fed. R. Civ. P. 56(a) and (b).  Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, at 323.  See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on

which that party will bear the burden of proof at trial." Howard
v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994).  In resolving
whether a given factual dispute requires submission to a jury, a
district court must view the record in the light most favorable to
the nonmoving party and resolve all reasonable inferences in the
nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir.
1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir.
1995)).  "That is, the court should give credence to the evidence
favoring the nonmovant as well as that 'evidence supporting the
moving party that is uncontradicted or unimpeached, at least to the
extent that that evidence comes from disinterested witnesses.' "
Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120
S.Ct. 2097, 2110 (2000) (quoting 9A C. Wright & A. Miller, Federal
Practice and Procedure § 2529, p.299).

### III. DISCUSSION

In 1993, Congress enacted the FMLA to balance the demands of
the workplace with the needs of families by entitling employees to
take reasonable medical and family-related leave, while at the same
time accommodating the legitimate needs of employers.  29 U.S.C. §
2601(b) (2000).  Among the substantive rights granted by the FMLA
to eligible employees is the right to 12 workweeks of leave during
any 12-month period for a number of medically-related reasons,
including the birth of a child; a "serious health condition" that
makes the employee unable to perform the functions of her position;

and in order to care for a spouse, child, or parent of the employee who has a "serious health condition." 29 U.S.C. § 2612(a)(1). An employee also retains a substantive right following leave "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position , 29 U.S.C. § 2614(a)(1).

Courts have recognized two different types of claims created by the the FMLA that are designed to enforce and protect the substantive rights granted under the Act. First, there is what is commonly referred to as an "interference" claim, which requires an employee to show only that she is entitled to the benefit she claims and that her employer "interfer[ed] with, restrain[ed], or den[ied]" the employee's exercise of the benefit. 29 U.S.C. § 2615(a)(1); Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1208(11th Cir. 2001); O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1353 (11th Cir. 2000). With this type of claim, the employer's motives for denying the employee the benefit to which she is entitled are irrelevant. Strickland, 239 F.3d at 1207-08. The other type of claim recognized under the FMLA is what is often called a "retaliation" claim, whereby an employee must prove that her employer intentionally discriminated against her by taking an adverse employment action against her for having exercised an FMLA right. Id. at 1207. "In other words, a plaintiff bringing a retaliation claim faces the increased burden of showing that his

employer's actions 'were motivated by an impermissible retaliatory or discriminatory animus.'" Id. (quoting King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999)).

The Court has previously resolved that Davis is not entitled to recover on her retaliation claim founded upon her termination. However, she asserts that her termination also gives rise to an interference claim. Further, at this point in the proceedings, Davis adheres to her contention that the ARC's assessment of points and associated disciplinary actions taken against her under the ARC's attendance policy support claims both for interference and retaliation under the FMLA. The Court will address these claims in turn.

**A. Termination**

First, Davis claims that, by terminating her employment on Monday, July 24, 2000, the ARC denied her right, guaranteed by the FMLA, to be reinstated to her former position or to an equivalent position following leave. See 29 U.S.C. § 2614(a)(1); Strickland, 239 F.3d at 1208. However, even assuming that Davis is correct in her assertion that her leave on the afternoon of Friday, July 21, 2000, was protected by the FMLA,[2] there is no dispute that she

---

[2] It might be assumed that Davis's son's asthma constituted a "serious health condition" for purposes of 29 U.S.C. § 2612(a)(1)(C). See 29 C.F.R. § 825.114(a)(2)(iii). Nonetheless, it is undisputed that Davis's son, despite his asthma, ultimately did not experience any apparent adverse reaction from being in the daycare center without power on Friday, July 21, 2000. Nor is there any dispute that he was not administered any particular medical care aside from his regularly scheduled medication after Davis brought him home. Thus, it would seem at least

returned to work the following Monday, July 24, to the same position she had previously held.   It was not until late that Monday afternoon that she was fired after Horschel confronted her about the discrepancy between her time sheet and the time she actually left on Friday.   Thus, it appears that Davis was "restored" to her identical position, albeit only briefly, following leave.

Further, "[a]n employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed with the company during the FMLA leave period."   <u>Parris v. Miami Herald Pub. Co.</u>, 216 F.3d 1298, 1301-02 (11th Cir. 2000)(<u>citing</u> 29 C.F.R. § 825.216(a); <u>O'Connor</u>, 200 F.3d at 1354).   Thus, an employer may escape liability if it is able to show that it terminated an employee for  reasons unrelated to the taking of FMLA leave.   <u>Strickland</u>, 239 F.3d at 1208.

In connection with the ARC's "first" motion for partial summary judgment, the Court concluded that the evidence was insufficient to show that the ARC's proffered reason for its decision to terminate Davis, the falsification of her time sheet, was not its true motivation.   Nothing in the current record alters the Court's determination on that issue.   There is no dispute that Davis's time

---

arguable whether Davis's leave was protected under the FMLA, as it is not entirely clear that her son's condition actually necessitated her to care for him that afternoon. <u>See</u> 29 C.F.R. § 825.116. Nonetheless, the Court need not decide whether Davis's leave that day was actually protected under the FMLA to resolve this claim, so the Court pretermits any further discussion of the issue.

card overstated by several hours the amount of time she worked on the Friday in question. Whether such a discrepancy was the result of an intent to deceive, as Horschel appears to have suspected, or merely an honest mistake, as Davis claims, it constituted a valid reason for the ARC to terminate Davis. Further, terminating an employee for falsification of a time sheet is obviously different from terminating an employee for taking leave, FMLA protected or not. Therefore, the Court concludes, the record shows that the ARC did not interfere with or deny Davis's substantive rights under the FMLA by terminating her employment. Accordingly, the ARC is entitled to summary judgment on Davis's interference claim insofar as such is premised upon her termination.

**B. Points and Discipline Pursuant to the Attendance Policy**

Davis also maintains that the ARC has interfered with her rights under the FMLA and unlawfully retaliated against her by virtue of its assessment of points and meting out discipline under its attendance policy. Davis alleges that she was assessed points in violation of the FMLA for absences necessitated by various medical problems and doctor visits relating to herself and other family member on numerous occasions and that, as a result, she received several verbal and written warnings and a three-day suspension without pay for excessive point accumulations.[3]

---

[3]At times, Davis seems to intimate that her termination also resulted from an application of discipline under the ARC's attendance policy. However, there is simply no evidence to support such a position.

Page 16 of 31

### 1.   Statute of Limitations

As a threshold matter, the ARC contends that many of the violations alleged by Davis in her complaint with respect to the application of the attendance policy to her occurred more than two years before Davis filed her complaint and are, therefore, untimely. The FMLA requires an action to be brought within two years of the last event constituting the alleged violation.  29 U.S.C. § 2617(c). Accordingly, the ARC urges that any alleged FMLA violations it might have committed before April 25, 1999 are time barred.

Davis responds first by pointing out that the FMLA statute of limitations is extended to within three years of the last event constituting the alleged violation if such violation was "willful." 29 U.S.C. § 2617(c); <u>Nero v. Industrial Molding Corp.</u>, 167 F.3d 921, 929 n.4 (5th Cir. 1999).  She emphasizes that she alleged in her complaint that the ARC's violations of the FMLA were willful, and she argues that the evidence would support such a finding. Therefore, Davis contends, she should be permitted to recover for FMLA violations occurring at least on or after April 25, 1998.

"Although the FMLA does not define the term 'willful,' the Supreme Court, in an analogous context, has ruled that a violation of the Fair Labor Standards Act ("FLSA") is 'willful' where an employer 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [Act].'"  <u>Settle v. S.W. Rodgers, Co., Inc.</u>, 998 F. Supp. 657, 663 (E.D. Va. 1998) (<u>quoting</u>

McLaughlin v. Richland Shoe Co., 486 U.S. 128, 130 (1988)). The Supreme Court further explained in McLaughlin that a plaintiff seeking to prove that an employer's violation of the FLSA was "willful" must do more than present evidence indicating that the employer was aware that the FLSA "was in the picture" or that the employer was merely negligent. 486 U.S. at 132-33. There is no reason to believe that these standards are not equally applicable to assess whether an employer's alleged violation of the FMLA is "willful" for purposes of 29 U.S.C. § 2617(c). See Settle, 998 F. Supp. at 663; Caucci v. Prison Health Services, Inc., 153 F. Supp. 2d 605, 609 (E.D. Pa. 2001); Sampson v. Citibank, F.S.B., 53 F. Supp. 2d 13, 19 (D.D.C. 1999).

The Court concludes that the evidence falls well short of indicating that any potential FMLA violation on the part of the ARC was willful under the principles enunciated in McLaughlin. The record shows that the ARC adopted a written policy designed to ensure its compliance under the FMLA and advise employees of their rights under that Act. Davis acknowledges both that the ARC's FMLA policy was communicated to her and other employees in their employment handbooks and that the ARC's policy employs standards that essentially mirror, and thus comport with, the Act. Indeed, there is also no dispute that the only time that Davis ever submitted a formal request for FMLA leave under the ARC's policy, in connection with the birth of her first son, such was granted and

she received pay for the leave until her accrued earned time was exhausted.[4]

Davis strenuously urges, however, that while the ARC's FMLA policy may comply with that Act, its attendance policy does not because points are assigned for medically-related absences. It is true that the FMLA prohibits an employer from assigning points to an employee under a no-fault attendance policy for leave taken pursuant to the FMLA. See 29 C.F.R. § 825.220(c); Bauer v. Varity Dayton-Walther Corp., 118 F.3d 1109, 1111 (6th Cir. 1997). However, the ARC's attendance policy expressly states that it does not apply to FMLA leave. Thus, on its face, the ARC's attendance policy does not violate the FMLA. It might be assumed for the moment that at least some of Davis's absences were occasioned by a "serious health condition," either of her own or of her son, and that she might have been entitled to FMLA leave for such absences. However, in order for leave to be protected under the FMLA, while an employee need not expressly mention the Act itself, she must give the employer enough information to put it on notice that the leave sought is for a potentially FMLA-qualifying reason. Strickland, 239 F.3d at 1209; Gay v. Gilman Paper Co., 125 F.3d 1432, 1436 (11th Cir. 1997). Once an employee informs his employer that potentially FMLA-qualifying

---

[4]The Court should not be understood as suggesting that it believes that an employer's adoption and promulgation of formal attendance and leave policies that comply with the FMLA are necessarily sufficient to show that an employer's subsequent violation of the Act could not be viewed as "willful" for statute of limitations purposes. Rather, it is simply one factor to consider.

leave is needed, the regulations place on the employer the burden of ascertaining whether the employee's absence actually qualifies for FMLA protection.  Strickland, supra; see also 29 C.F.R. §§ 825.302(c), 825.303(b).  However, courts have indicated that where an employee or her spokesperson provides only meager information to the employer, such as that she is having "some tests run," or that she will be absent for a day because she is "sick" or "in pain," such does not trigger an employer's duty to further investigate whether an absence is potentially FMLA-qualifying.  See Gay, supra, 125 F.3d at 1436; Satterfield v. Wal-Mart Stores, Inc., 135 F.3d 973, 980-81 (5th Cir. 1998).  See also Collins v. NTN-Bower Corp., ___ F.3d ___, ___, 2001 WL 1538973 (7th Cir. 2001) ("'Sick' does not imply 'a serious health condition'").

In the instant case, what Davis is claiming is that the ARC assigned her points for absences it had reason to know were medically related.  However, the Court would first note that not all medically-related absences will qualify as protected leave under the FMLA; the Act guarantees leave only for certain reasons, such as a birth or where the leave is caused by a "serious health condition" to either the employee or certain family members.  So not every illness or trip to the doctor entitles an employee to protected leave.  Davis concedes that she never expressly invoked the FMLA on any of these occasions, despite the fact that she had previously requested and been granted leave pursuant to the procedures of the

ARC's formal FMLA policy.  It also must be acknowledged that the written reasons she presented to her employer for taking leave on the occasions when she was assessed points at least arguably do not, on their face, make it clear that the leave sought was, in fact, for a "serious health condition" and thus FMLA-qualifying.  Rather, what caused the ARC to assign her the points in violation of the FMLA, Davis would seem to allege, is that the ARC was obligated to further investigate to determine that the leave was actually FMLA-qualifying but it failed to do so.  See Plaintiff's Brief at 17-18 ("ARC automatically assessed [points] to Ms. Davis for unscheduled absences relating to her own illness and the serious medical condition of her son. . . . ARC did so without gaining or requesting additional information from Ms. Davis.")  However, there is nothing in the record to indicate that this potential sin, which would principally be one of omission rather than commission, was done intentionally or even wantonly.  While the ARC potentially might have been negligent in its assessment of whether Davis's leave was protected, there is insufficient evidence to show that any of the ARC's potential violations of the FMLA were "willful" within the meaning of 29 U.S.C. § 2617(c).  Therefore, the Court holds that the two-year statute of limitations applies.

### 2. The Continuing Violation Doctrine

Davis additionally argues that, despite the statute of limitations,  she should be permitted to recover for all of the FMLA

violations she alleges that arise out of the ARC's assignment of points and disciplinary actions relating to its attendance policy. In support, she argues that the ARC's attendance policy was in effect during the entire period of her employment and that the ARC's assessment of points against her occurred throughout the course of her employment and was part of a pattern and practice of violating the FMLA. Therefore, she claims, she might recover for violations that occurred outside the statute of limitations under the "continuing violation" doctrine. The Court disagrees.

"The continuing violation doctrine is premised on the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated." Hipp v. Liberty Nat. Life Ins. Co., 252 F.3d 1208, 1222 (11th Cir. 2001) (quoting Alldread v. City of Grenada, 988 F.2d 1425, 1432 (5th Cir. 1993)). As recently explained by the Fifth Circuit,

> [It] relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period. Messer v. Meno, 130 F.3d 130, 135 (5th Cir. 1997). The continuing violation doctrine is designed to 'accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered timely.' Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 344 (7th Cir. 1999).

Celestine v. Petroleos de Venezuella SA, 266 F.3d 343, 351-52 (5th

Cir. 2001). "In determining whether a continuing violation exists, courts should consider whether 'the [alleged discriminatory] act [has] the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate.'" <u>Berry v. Bd. of Supervisors</u>, 715 F.2d 971, 981 (5th Cir.1983) (<u>as quoted in</u> <u>Hipp</u>, <u>supra</u>, 252 F.3d at 1222). Thus, it is "clear that a one-time employment event, including the failure to hire, promote, or train and [dismissals] or demotions, is 'the sort of discrete and salient event that should put the employee on notice that a cause of action has accrued.'" <u>Celestine</u>, <u>supra</u>, 266 F.3d at 352 (bracketed material added)(<u>quoting</u> <u>Huckabay v. Moore</u>, 142 F.3d 233, 240 (5th Cir. 1998)). Such "discrete adverse actions, although [unlawfully] motivated, cannot be lumped together with the day-to-day pattern of . . . [discrimination or] harassment" and therefore, if otherwise untimely, cannot be saved by the continuing violation doctrine." <u>Id.</u> (quoting <u>Huckabay</u>, 142 F.3d at 240).

The Court would first note that, as explained previously, the ARC's attendance policy does not, on its face, violate the FMLA, as the policy expressly excludes FMLA leave from its purview. Thus, there is no reason to think that such policy itself gives rise to any sort of continuing violation. Moreover, it is undisputed that,

under the ARC's policy, points are automatically removed from an employee's attendance record one year after being charged, so it is difficult to see how points assigned outside the limitations period that have rolled off an employee's record, even if initially assigned improperly, should be a basis for recovery as a continuing violation.  In any event, to the extent that Davis asserts that the improper assignment of attendance points and resulting verbal and written warnings and her December 1996 three-day suspension can support FMLA claims, the Court concludes that such actions, particularly the suspension, are in the nature of events that would have put a reasonable person on notice that her rights were being violated.   Therefore, Davis cannot rely upon the continuing violation doctrine to resurrect claims based upon such violations that occurred more than two years before she filed her complaint.

### 3.  Points and Resulting Discipline as Retaliation

Davis claims that she might prevail on a retaliation claim based upon her allegations that the ARC wrongfully assigned her points for leave that was allegedly FMLA-qualifying and took disciplinary actions against her based upon the counting of such points.  In order to prove a prima facie case of retaliation under the FMLA, an employee must show (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that there is a causal nexus between the two.  Strickland, 239

F.3d at 1207.  The ARC argues that even assuming Davis engaged in protected activity, neither the assignment of points nor any attendance-related discipline meted out to her within two years prior to the filing of her complaint was sufficiently substantial to constitute an adverse employment action necessary to support the claim.  The Court agrees.

The Eleventh Circuit has indicated that the FMLA's protection against retaliation extends to adverse actions which fall short of ultimate employment decisions, such as hiring and firing.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999). However, "not everything that makes an employee unhappy is an actionable adverse action." Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1118 (11th Cir. 2001) (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)).  "Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Williams v. Bristol-Myers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996) (quoted in Doe v. Dekalb County School Dist., 145 F.3d 1441, 1449 (11th Cir. 1998)).  Rather, "some threshold level of substantiality . . . must be met for unlawful discrimination to be cognizable under the anti-retaliation clause" of the FMLA.  Graham, supra (quoting Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998)).  Thus, there must be some "conduct by the employer that alters the employee's

compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." <u>Bass v. Board of County Com'rs, Orange County, Fla.</u>, 256 F.3d 1095, 1118 (11th Cir. 2001) (<u>quoting</u> <u>Gupta v. Florida Bd. of Regents</u>, 212 F.3d 571, 587 (11th Cir. 2000)). Accordingly, relatively mild forms of discipline, such as counselings and written and verbal warnings, even if motivated by some prohibited animus, are generally deemed insufficiently substantial to support a retaliation claim unless there is some indication that such discipline was subsequently used as a basis to justify a more tangible adverse job action, such as the denial of a promotion, for example. <u>See</u> <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1240-41 (11th Cir. 2001).

It might be assumed that the ARC was motivated to assign attendance points to Davis because she took leave that was protected by the FMLA. However, the record shows that the assignment of points does not, in and of itself, have any tangible effect upon the terms and conditions of employment at the ARC. Rather, it is the <u>accumulation of a particular number of points</u> by an employee that may subsequently cause the ARC to take disciplinary action. Thus, the Court concludes that the assignment of points does not in itself constitute an adverse employment action for purposes of a retaliation claim. The Court has no doubt that certain forms of disciplinary action imposed as a result of an employee's having

being assigned points in violation of the FMLA could constitute an adverse employment action so as to support an FMLA claim. And while Davis's three-day suspension in 1996 might have fit that bill, it is time barred, as explained previously. Likewise, there is no evidence indicating that Davis was terminated based upon the ARC's attendance policy. It would appear, rather, that the only attendance-related discipline Davis received within the limitations period was comprised of two verbal warnings, one on June 3, 1999, and another on May 30, 2000, for having exceeded 10 points in the previous 12 months. There is no evidence suggesting that either one of these warnings had any tangible adverse impact upon the terms or conditions of Davis's employment, her status as an employee, or her opportunities for advancement. Accordingly, the Court concludes that these verbal warnings, like the assignment of attendance points, do not in themselves constitute adverse job action. The ARC's motion for summary judgment is due to be granted as to Davis's retaliation claim based upon the fact that she was improperly assigned attendance points and subjected to discipline as a result.

### 4.  Points and Resulting Discipline as Interference

And finally, Davis also claims that the ARC's assignment of attendance points and disciplinary actions associated therewith give rise to an FMLA interference claim. To prevail on an interference claim, an employee must show (1) that she is entitled to the benefit

she claims and (2) that her employer "interfer[ed] with, restrain[ed], or den[ied]" the employee's exercise of the benefit. 29 U.S.C. § 2615(a)(1); <u>Strickland</u>, 239 F.3d at 1208(11th Cir. 2001); <u>O'Connor</u>, 200 F.3d at 1353.

The ARC argues that it is entitled to summary judgment on this claim for a number of reasons, among them that Davis failed to afford proper notice that the periods of leave she sought were protected under the FMLA. However, the Court will only address the ARC's argument, which the Court deems dispositive, that, even assuming that Davis' leave in question was actually protected by the FMLA, neither any improper assignment of attendance points for those absences nor any associated discipline imposed therefor would entitle Davis to any form of relief against the ARC. More specifically, the ARC contends that even if such actions on its part might be said to have technically "interfered with" Davis's FMLA rights, she has not presented any evidence indicating how she was damaged or how she might be entitled to injunctive relief.

The Eleventh Circuit has held that summary judgment may be appropriate for an employer on an employee's interference claim despite the fact that the employer may have "committed certain technical violations under the FMLA," where it appears that the plaintiff has not suffered any adverse employment action or any other damage for which he might recover under the Act. <u>Graham</u>, 193 F.3d at 1284. Thus, the Court of Appeals affirmed such a summary

judgment, noting its agreement with the court below that "a plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most of it." Id. at 1275.

The FMLA provides that an employer who violates the Act shall be liable for damages in an amount to compensate for an employee's loss of "any wages, salary, employment benefits, or other compensation denied or lost" to the employee because of the violation. 29 U.S.C. § 2617(a)(1)(A)(i)(I). The statute also allows that, in such cases where an employee has not actually lost or been denied any such wages, benefits, or compensation, an employee may recover "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks of wages or salary . . . ." 29 U.S.C. § 2617(a)(1)(A)(i)(II). And finally, the FMLA authorizes a court to grant appropriate equitable relief, including employment, reinstatement, and promotion. 29 U.S.C. § 2617(a)(1)(B). However, punitive and mental distress damages are not allowed under the FMLA. Godwin v. Rheem Mfg. Co., 15 F. Supp.2d 1197, 1205 n.9 (M.D. Ala. 1998) (citing McAnnally v. Wyn South Molded Products, Inc., 912 F.Supp. 512 (N.D. Ala. 1996)).

The Court has found that Davis, like the plaintiff in Graham, has not suffered any adverse employment action in violation of the FMLA. Likewise, it is undisputed both that Davis, like Graham, was never actually denied any sought leave relating to any health

condition, "serious" or otherwise, and that she was paid for the vast majority of such leave.[5] Nor is there any indication that the ARC ever actually denied Davis any other benefit to which she was entitled under the FMLA.  If the ARC did assess attendance points against Davis for absences that were protected under the FMLA, then it could be said that such technically "interfered with" her exercise of FMLA rights.  29 C.F.R. § 825.220(b) defines "interference" broadly to include "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." And the regulations further provide that FMLA leave may not result in points being assessed under a no-fault attendance policy.  Thus, the assignment of points for FMLA leave would clearly seem to burden or discourage the taking of such leave.  Nonetheless, the evidence shows that Davis's having been assigned points did not cause her to lose any salary, wages, benefits or other monetary losses of any kind.  Thus, the evidence shows that Davis has not endured any losses for which she might be awarded damages under 29 U.S.C. § 2617(a).  Moreover, although Davis has sought equitable relief, the Court has determined that her termination did not violate the FMLA, so she would not be entitled to reinstatement.  Further, with the valid severance of the employment relationship between Davis and the ARC, it is clear that no other injunctive relief could be

---

[5]Of course, it should be recognized that the Act allows an employer to choose to designate FMLA leave as unpaid. See 29 C.F.R. § 825.207.

appropriate in her favor against the ARC, notwithstanding what might have been past "technical" violations of the Act.   The Court concludes that the ARC is entitled to summary judgment on Davis's remaining interference claims.

### IV.   CONCLUSION

Based on the foregoing, the Court concludes that the ARC's "second" motion for partial summary judgment (Doc. 25) on Davis's remaining FMLA claims is due to be **GRANTED**.  As the Court finds that there is no genuine issue of material fact and that the ARC is entitled to judgment as a matter of law on all such claims, they, along with this action in its entirety, are due to be **DISMISSED** with prejudice.   A separate order will be entered.

**DONE** and **ORDERED** this __21st__ day of December, 2001.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

Page 31 of 31